**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

FELICIA LAMPKIN,

                  Plaintiff,

               v.

PATRICK R. DONAHOE, *Postmaster General, United States Postal Service*,

                Defendant.

Civil Action No. 14-5686 (MAS) (DEA)

**MEMORANDUM OPINION**

**SHIPP, District Judge**

     This matter comes before the Court on Defendant Patrick R. Donahoe's ("Defendant") Motion for Summary Judgment. (ECF No. 16.) Plaintiff Felicia Lampkin ("Plaintiff") opposed (ECF No. 18), and Defendant replied (ECF No. 19). The Court has carefully considered the parties' submissions and decides the motion without oral argument pursuant to Local Civil Rule 78.1. For the reasons stated below, Defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part.

I.    **Background**

A.    **Undisputed Facts[1]**

Plaintiff "began working for the [United States] Postal Service in 1994 as a mail handler." (Def.'s Statement of Undisputed Material Facts ("SUMF") ¶ 1, ECF No. 16-28.)[2]  As a mail handler, Plaintiff's "job duties included loading mail trucks" and "she worked in the Trenton Processing and Distribution Center ('P&DC')." (*Id.* ¶ 2.)  After working as a mail handler for six years, Plaintiff "was promoted to supervisor in 2000." (*Id.* ¶ 3.)  From 2000 to 2006, Plaintiff was a level 17 supervisor. (*Id.* ¶ 4.)  In 2006, Plaintiff was "detailed" to a level 19, "meaning that she technically remained on level 17 but because she was 'detailed' to a higher level she received a 5% pay increase, as well as some supervisory responsibilities over other level 17 supervisors." (*Id.*)  Plaintiff remained "detailed" to a level 19 for five years, until 2011. (*Id.* ¶ 5.)  In 2011,

---

[1] Local Civil Rule 56.1(a) permits a nonmoving party on summary judgment to provide "a supplemental statement of *disputed* material facts." (Emphasis added).  Here, Plaintiff has filed a Counter-Statement of *Undisputed* Material Facts ("CSUF"). (ECF No. 18-11.)  In deciding this Motion, the Court adopts the approach taken in *Mehr v. Atlantic City*:

> [T]he Local Rules do not contemplate a nonmoving party furnishing its own statement of undisputed material facts. Indeed, aside from not being contemplated by the local civil rules, such a document is not necessary to defeat summary judgment, as Plaintiffs must only show that some material fact is in dispute, and need not affirmatively prove their case at this point. However, as Defendants have fully responded to this "Counterstatement," and the Counterstatement helpfully cites to portions of the record, the Court sees no reason not to rely on the contents therein.

No. 12-4499, 2014 WL 4350546, at *3 n.3 (D.N.J. Sept. 2, 2014).

[2] For efficiency, the Court omits separate citations to Plaintiff's admissions to Defendant's SUMF (Pl.'s Resp. to Def.'s SUMF, ECF No. 18-10) where Plaintiff plainly "Admitted" without further elaboration.  Similarly, the Court omits citations to Defendant's Response to Plaintiff's Counter-Statement of Facts (Def.'s Resp. to Pl.'s CSUF, ECF No. 19-1) where Defendant admits to Plaintiff's allegation.  The Court further omits duplicative citation to both parties' statements of facts where the parties allege identical facts.

Plaintiff transferred to Ocoee, Florida and "is currently a supervisor of customer service at a post office in Kissimmee, Florida." (*Id.* ¶¶ 5-6.)

"The Trenton P&DC is a large processing and distribution center; it processes millions of pieces of mail every day." (*Id.* ¶ 7.) "The facility operates 24 hours a day, and the work shifts are divided into three 'tours.'" (*Id.* ¶ 8.) During the relevant time period, Plaintiff "was assigned to 'Tour 1,' which is [an] overnight shift." (*Id.* ¶ 9.) "Tour 2 was [a] daytime shift . . . and Tour 3 was from late afternoon until roughly 11 p.m." (*Id.* ¶ 10.) "Because [Plaintiff] worked the overnight [shift], she received an 'overnight premium,' meaning that she was paid approximately 5% more than equivalent supervisors on Tours 2 and 3." (*Id.* ¶ 11.)

Of the three Tours, "Tour 1 was the busiest, meaning it had the most mail volume, and more than 300 employees per shift." (*Id.* ¶ 12.) During a Tour 1 shift, there were "approximately 11 to 12 level 17 supervisors (including [Plaintiff]), all of whom reported to the level-22 Tour 1 manager, a woman named Yvette Jackson[3] (with [Plaintiff] sharing some managerial responsibilities[4] due to her detail to a level 19)."[5] (*Id.* ¶ 13.) In contrast, "Tours 2 and 3 had fewer

---

[3] Yvette Jackson ("Jackson") "was the manager of Tour 1 during all of 2009-2011." (Def.'s SUMF ¶ 17.)

[4] For example, "[w]hen Ms. Jackson was not at work, [Plaintiff] handled her duties." (Pl.'s CSUF ¶ 12.)

[5] Plaintiff responds to Defendant's SUMF by stating: "Admitted." (Pl.'s Resp. to Def.'s SUMF ¶ 13.) In Plaintiff's subsequent CSUF, Plaintiff states, "Yvette Jackson, the other Manager on Tour 1 was not [Plaintiff's] supervisor." (Pl.'s CSUF ¶ 11.) Defendant denies this fact and cites to Plant Manager Russell Herrick's ("Herrick") deposition. (Def.'s Resp. to Pl.'s CSUF ¶ 11.) Given that Plaintiff already admitted to the specific hierarchical structure laid out in Defendant's SUMF, the Court finds Defendant's SUMF ¶ 13 undisputed, and finds Plaintiff's less specific statement in her CSUF ¶ 11 to be disputed.

employees, volume, and supervisors than Tour 1," and "Tours 2 and 3 each had their own level-22 manager."[6] (*Id.* ¶¶ 14, 16.)

        1.   Denial of Transfer

     "The three Tour managers reported to the Plant Manager, who, during the relevant time period, was Russell Herrick [('Herrick')]." (*Id.* ¶ 19.) "In August or September of 2010, [Plaintiff] told Herrick that she wanted to transfer to . . . Orlando, Florida."[7] (*Id.* ¶ 20.) Plaintiff "told Herrick that she wanted to transfer because her husband, who was in the military, was soon going to be transferred to Orlando, and . . . because she had learned that [Sung] Choi [("Choi")][8] would be returning to the Tour 1 shift."[9] (*Id.* ¶ 21.) "Initially[,] Herrick told [Plaintiff] a transfer was doable." (Pl.'s CSUF ¶ 46.) "Herrick, as a Plant Manager in Trenton, did not have [the] authority to place [Plaintiff] at another facility in a different district."[10] (Def.'s SUMF ¶ 22.) Herrick

---

[6] "Tour 2 was managed by level-22 Steve Roman, until he retired in early 2010 and Bill Jones [('Jones')], a level 17, was temporarily detailed to a level 22 and assumed managerial responsibilities." (Def.'s SUMF ¶ 18.) "Tour 3 was managed by level-22 Butch Moore until early 2011, when Roger Danbury [('Danbury')], a level 17, was detailed to a level 22 and managed Tour 3." (*Id.*)

[7] Defendants state that Plaintiff specifically asked to transfer "to a similar level position" in Orlando, Florida, but Plaintiff objects by stating: "the cited passage from [Plaintiff's] deposition does not state she sought a similar position in Orlando, Florida." (*Id.* ¶ 20; Pl.'s Resp. to Def.'s SUMF ¶ 20.) Plaintiff later admits to the same fact without reservation, however, in her response to Defendant's SUMF ¶ 28. The Court therefore deems Defendant's SUMF ¶ 20 undisputed.

[8] Plaintiff's connection to Sung Choi is explained below. *See infra* I.A.2.

[9] Plaintiff admits but further elaborates that: "she told Herrick her [h]usband was being transferred and he was her support system to deal with her health issues and that was why she needed to transfer." (Pl.'s Resp. to Def.'s SUMF ¶ 21.) The Court deems Defendant's SUMF ¶ 21 undisputed under Local Civil Rule 56.1(a).

[10] Plaintiff admits but further elaborates that: "Herrick did not have the authority to unilaterally place Plaintiff in another facility. But he was involved in the process." (Pl.'s Resp. to Def.'s SUMF ¶ 22.)

testified that "he could delay a transfer if the person seeking a transfer was working a 'critical job,' in which case he would 'negotiate a time that they could leave.'" (Def.'s Resp. to Pl.'s CSUF ¶ 82.) "Trenton is part of the Postal Service's 'South Jersey' district, which is, in turn, a part of the 'Eastern Area' . . . ." (Def.'s SUMF ¶ 23.) "Orlando, where [Plaintiff] wanted to transfer, is not part of the Eastern Area, but rather is part of the 'Sun Coast District.'" (*Id.*)

"Herrick met with Andy Keen [("Keen")], the District Human Resource Manager, to inform him of [Plaintiff's] desire to transfer and to offer to assist in that regard."[11] (*Id.* ¶ 24.) Plaintiff "submitted medical documentation to Herrick, claiming that she required a transfer to Florida as a reasonable accommodation." (*Id.* ¶ 25.) "On March 9, 2011, Herrick wrote to [Plaintiff] and told her that he was unable to provide her the transfer she requested, but he was forwarding her information to the 'DRAC' – the District Reasonable Accommodations Committee." (*Id.* ¶ 26.)

"The DRAC, which was chaired by a woman named Theresa Hensel [('Hensel')], held a meeting with [Plaintiff] two weeks later, on March 24, 2011." (*Id.* ¶ 27.) "At the meeting, [Plaintiff] explained that . . . she believed she had a mental disability in that she was unable to cope with the stresses of her job, that she required a reasonable accommodation, and that the only accommodation that would allow her to perform her essential job functions was a transfer to a similar-level position in the Orlando area with hours between 5 a.m. to 5 p.m., Monday through Friday." (*Id.* ¶ 28.) "The DRAC asked [Plaintiff] to submit medical documentation setting forth her limitations, which [Plaintiff] provided on or about April 13, 2011." (*Id.* ¶ 29.)

---

[11] Plaintiff's response to Defendant's SUMF is: "Admitted that Herrick so stated." (*Id.* ¶ 24.) Plaintiff does not deny that the statement is true. (*Id.*) Plaintiff does not identify any material facts she disputes, and fails to cite any affidavits or other documents in support of her dispute as required under Local Civil Rule 56.1(a). The Court, therefore, deems Defendant's SUMF ¶ 24 undisputed.

"In early April 2011, Keen emailed his counterpart in the Sun Coast District to inquire about vacancies that might suit [Plaintiff's] restrictions, and on April 16, 2011, he received an email response indicating that 'Suncoast does not have a vacant position that meets the below parameters,' *i.e.*, [Plaintiff's] restrictions." (*Id.* ¶ 30.) "Accordingly, by letter dated April 19, 2011, Hensel informed [Plaintiff] that her request was denied because there were no vacant, funded positions in Florida that met her requirements." (*Id.* ¶ 31.)

"However, in May 2011, the Postal Service identified additional positions that had the potential to meet [Plaintiff's] conditions, and in June 2011 [Plaintiff's] attorney identified additional positions as well." (*Id.* ¶ 32.) "Within less than two months, on August 2, 2011, [Plaintiff] was informed via letter . . . that her transfer request had been approved, and she accepted a position as a supervisor of customer service in Ocoee, Florida, which is a suburb of Orlando." (*Id.* ¶ 33.)

### 2.   Altercation with Sung Choi

"On October 12, 2009, [Plaintiff] had a verbal altercation with a Tour 1 craft employee named Sung Choi."[12] (*Id.* ¶ 34.) Plaintiff "testified that when she gave Choi a directive, 'he began to yell,' . . . after which they moved to a conference room where Choi 'got up across the table, leaned all the way over, and was pointing and yelling at [her].'" (*Id.* ¶ 35.) "Choi tried to leave the room but was unable to do so because he lacked the necessary swipe card, and when [Plaintiff] attempted to let him out, they were 'toe to toe' and Choi began to scream obscenities." (*Id.* ¶ 36.) "Two witnesses largely corroborated [Plaintiff's][13] version of events." (*Id.* ¶ 37.)

---

[12] Plaintiff's response to Defendant's SUMF states: "Denied as stated." (Pl.'s Resp. to Def.'s SUMF ¶ 34.) The Court finds this fact immaterial, as the details of the altercation are undisputed.

[13] Plaintiff's response to Defendant's SUMF states: "Two witnesses corroborated Plaintiff's version of events." (Pl.'s Resp. to Def.'s SUMF ¶ 37.)

"Before this altercation, there had never been any problems between [Plaintiff] and Choi." (*Id.* ¶ 38.) Plaintiff "complained to Herrick about Choi's actions, and Herrick placed Choi on 'emergency placement,' meaning that Choi's access badge was taken from him and he was not permitted back into the facility while the Postal Service took administrative steps to terminate his employment." (*Id.* ¶ 39.) "Herrick met with Choi and decided to 'go [forward] with the removal.'" (*Id.* ¶ 40.) "Two other Tour 1 supervisors, Yvette Jackson and Richard Hogan, concurred in the proposed removal." (*Id.* ¶ 41.)

In response, the "American Postal Workers Union filed a grievance to prevent Choi's removal." (*Id.* ¶ 42.) "In February 2010[,] the grievance was resolved via a pre-arbitration settlement, in which the representatives of the union and management agreed that Choi would be returned to work with two months of back pay." (*Id.* ¶ 43.) "When Herrick was notified that Choi would be returning, he was concerned about placing Choi on the same shift as [Plaintiff], and thus, at first, Choi was scheduled to work on a different tour." (*Id.* ¶ 44.) "During this time [Plaintiff] 'never saw him.'" (*Id.* ¶ 45.) "However, Choi's union again filed a grievance, arguing that Choi had the right to return to Tour 1, and once again the grievance was successful and Choi was reassigned to Tour 1 on August 5, 2010." (*Id.* ¶ 46.) Plaintiff "and Choi had no further incidents . . . and within two months after Choi returned to Tour 1, [Plaintiff] stopped working in the Trenton P&DC and eventually transferred to Florida, and she has had no further contact with Choi since the transfer."[14] (*Id.* ¶ 47.)

---

[14] Plaintiff responds to Defendant's SUMF ¶ 47 by stating: "Admitted." (Pl.'s Resp. to Def.'s SUMF ¶ 47.) In Plaintiff's CSUF, however, Plaintiff alleges that she "worked at the Trenton P&DC continuously from 1994 until she left in 2011, except when she worked at another Postal facility due to the anthrax scare." (Pl.'s CSUF ¶ 4.) Defendant responds to Plaintiff's CSUF that: "she stopped working at the Trenton P&DC on or about October 1, 2010," and cites Plaintiff's deposition. (Def.'s Resp. to Pl.'s CSUF ¶ 4.) The Court finds this fact immaterial because the Court dismisses Plaintiff's Hostile Work Environment Claim based on Plaintiff's failure to

3.    Denial of Training

Additionally, Plaintiff "claims that she was denied 'FSS Training' on the basis of her race." (*Id.* ¶ 48.) "'FSS' stands for 'flat sorter sequencing.'" (*Id.* ¶ 49.) "'[T]his is a big machine processing a lot of mail really quickly,' usually hundreds of thousands of pieces of mail per tour." (*Id.* ¶ 50.)  Plaintiff "did not operate this machine herself, nor did she supervise employees who ran the machine; rather, it was operated by craft employees, who in turn were supervised, and [Plaintiff's] role was to 'supervise the managers who supervised the employees.'" (*Id.* ¶ 51.) "Operation of this machine was never [Plaintiff's] responsibility." (*Id.* ¶ 52.) "At some point before 2010, [Plaintiff], Bill Jones, and another supervisor ([Plaintiff] could not remember who) traveled to a Postal facility in Virginia to receive FSS training." (*Id.* ¶ 53.)  "That training lasted 'a couple days,' . . . and 'it was kind of like an introduction to the machines.'" (*Id.* ¶ 54.)

"In 2010, another training, a 'train the trainer' training, was scheduled to occur in the same facility in Virginia." (*Id.* ¶ 55.)  Plaintiff "testified that Herrick told her that he would like her to attend this second training, . . . and she believed that Bill Jones and another supervisor were also asked to go." (*Id.* ¶ 56.)  Subsequently, "Herrick told her that 'no managers' would be attending the training, and he was thus sending supervisors who were lower levels than Jones and [Plaintiff], who, though both level 17, were detailed to higher levels." (*Id.* ¶ 58.)  "Herrick testified at his deposition that the reason he did not send Plaintiff to the FSS training was because she had a lot of potential and she was running a tour." (Pl.'s CSUF ¶ 71.)  "[Plaintiff] was not denied any promotion due to not attending this training . . . nor was her pay affected."[15] (Def.'s SUMF ¶ 58.)

---

sufficiently establish Defendant's proffered legitimate reasons for its actions as pretexts for discrimination.

[15] Plaintiff's response to Defendant's SUMF states: "Denied." (Pl.'s Resp. to Def.'s SUMF ¶ 58.) Plaintiff's response does not state each material fact in dispute and does not cite to affidavits or

4.    Unpaid T-Time; CA-2 Paperwork

Next, "[n]on-supervisory Postal 'craft' employees [were] paid on an hourly basis (and [were] entitled to time-and-a-half for overtime), but supervisory employees such as [Plaintiff] were salaried." (*Id.* ¶ 59.) "If a supervisor worked more than eight hours during any particular shift, she would be entitled to extra pay known within the Postal Service as 'T-[T]ime.'" (*Id.* ¶ 60.) "During 2010 (and most of her tenure at the Trenton P&DC) [Plaintiff] worked the overnight shift which ended at approximately 7:30 a.m." (*Id.* ¶ 61.) Plaintiff "alleges that Herrick, the Plant Manager, would often[16] require her and other supervisors to attend meetings that began around the same time that her tour was ending, and these meetings caused her to work beyond the scheduled end of her shift." (*Id.* ¶ 62.) "When [Plaintiff] questioned . . . Herrick about why she was not being paid to attend these meetings, Herrick[] told her she had to have a thick skin if she wanted to be a manager."[17] (Pl.'s CSUF ¶ 19.) "Herrick testified that [Plaintiff] was required to attend meetings" but Defendant alleges that Herrick "did not know whether attending a meeting would cause her to work more than 8 hours in a shift." (Def.'s Resp. to Pl.'s CSUF ¶ 68.)

---

other documents in support as required by Local Civil Rule 56.1(a). Moreover, in Plaintiff's CSUF, Plaintiff fails to allege any conflicting facts. "[A]ny statement, or portion thereof, that is not clearly denied—in *substance*, not merely with the label 'disputed'—and with a proper citation to the record in a responsive Rule 56.1 statement is deemed admitted." *Juster Acquisition Co. v. N. Hudson Sewerage Auth.*, No. 12-3427, 2014 WL 268652, at *1 n.1 (D.N.J. Jan. 23, 2014). Here, given Plaintiff's blanket statement of "Denied" without citation to the record, especially in light of Plaintiff's failure to allege any conflicting facts in her CSUF, the Court deems Defendant's SUMF ¶ 58 undisputed.

[16] The parties dispute how often Plaintiff was required to attend these meetings. (Pl.'s CSUF ¶ 18; Def.'s Resp. to Pl.'s CSUF ¶ 18.)

[17] Defendant's response to Plaintiff's CSUF states: "Denied." (Def.'s Resp. to Pl.'s CSUF ¶ 19.) The Court finds this fact immaterial because the Court decides the unpaid T-Time claims on unrelated grounds. *See infra* IV.A.3, IV.C.

Plaintiff "alleges that in 2008 Herrick instructed her not to swipe her card when she attended these meetings (which would have recorded the fact that she was entitled to T-time) because, she alleges, Herrick believed that employees who sought T-Time had a 'craft mentality' that was unsuitable for supervisors."[18] (Def.'s SUMF ¶ 63.) "As a result of this meeting, Plaintiff had a nervous breakdown."[19] (Pl.'s CSUF ¶ 21.) Plaintiff testified that she was required to "work off the clock at least one to four times a week from 2008 through 2010."[20] (Pl.'s CSUF ¶ 25.) Plaintiff further testified that she recalled instances where "Jackson would question Supervisors who swiped their cards to get T-[T]ime."[21] (*Id.* ¶ 28.)

"Plaintiff asked for a CA-2 form used for work related injuries as she believed her breakdown was work related." (*Id.* ¶ 22.) "Plaintiff did not file a CA-2 in 2008 because she felt bullied because of the thick skin comment and Herrick's craft mentality remark." (*Id.* ¶ 23.) "Plaintiff believed that if she submitted the worker's compensation request form, her career as a manager would have been over at that time." (*Id.* ¶ 24.)

---

[18] Plaintiff further alleges that: "Herrick also told [Plaintiff] that if she wanted to swipe her card, then she should be a craft employee. He asked her if she wanted to go back down and be a supervisor." (Pl.'s CSUF ¶ 20.) Defendant denies without citation to any affidavit or document Plaintiff's characterization of Herrick's statements. (Def.'s Resp. to Pl.'s CSUF ¶ 20.) The Court, however, finds this fact immaterial as the Court decides the unpaid T-Time claims on unrelated grounds. *See infra* IV.A.3, IV.C.

[19] Defendant's response to Plaintiff's CSUF "denies that there is any independent evidence in the record to corroborate this assertion, or any expert evidence tying an alleged 'nervous breakdown' to workplace stress." (Def.'s Resp. to Pl.'s CSUF ¶ 21.) The Court finds this fact immaterial as the Court decides the Defendant's Motion regarding Plaintiff's Rehabilitation Act Claim on unrelated grounds. *See infra* IV.B.

[20] Defendants admit only that Plaintiff testified to this effect, and dispute whether Plaintiff in fact worked off the clock. (Def.'s Resp. to Pl.'s CSUF ¶ 25.)

[21] Defendant "[a]dmitted that [Plaintiff] so testified." (Def.'s Resp. to Pl.'s CSUF ¶ 28.)

5.     Unpaid T-Time; Disparate T-Time Opportunities

Plaintiff "was paid for approximately 71 hours of T-[T]ime in 2010 . . . ." (Def.'s SUMF

¶ 64.) Plaintiff "alleges that she was the victim of illegal discrimination because two white male

supervisors – Jones (who had been detailed to a level 22 in charge of Tour 2) and Danbury (a level

17 detailed to a 19 who worked under Butch Moore on Tour 3) – received more T-time than she

did in 2010." (*Id.* ¶ 65.)   Danbury testified that there was "a general directive to reduce T-Time

due to an ongoing "'budget crunch.'"  (Def.'s Resp. to Pl.'s CSUF ¶ 87.)

"According to [Plaintiff], she worked more than 71 hours of T-[T]ime eligible hours in

2010, but there is no record of these hours because she did not swipe her timecard to record her

time on the timekeeping system."[22]  (Def.'s SUMF ¶ 66.)  Plaintiff "testified that in lieu of swiping

her card she took contemporaneous notes to record her extra hours, but her notes were lost when

she moved to Florida, and there is thus no record at all of how many hours she claims to have

worked." (*Id.* ¶ 67.) "Although [Plaintiff] [sic][23] compared herself to Danbury and Jones, as noted

above, there were many other supervisors in the Trenton P&DC, some of whom received more T-

[T]ime than [Plaintiff] in 2010, and some of whom received less." (*Id.* ¶ 68.) "The T-[T]ime for

all supervisors at the Trenton P&DC in 2010 can be summarized as follows":[24]

---

[22] Plaintiff's response to Defendant's SUMF states: "Admitted that [Plaintiff] worked more than
71 hours of T-[T]ime eligible hours in 2010.  Plaintiff was told not to swipe her card when working
over her scheduled hours." (Pl.'s Resp. to Def.'s SUMF ¶ 66.)

[23] Defendant writes: "although *Jones* compared herself to Danbury and Jones," which, based on
the context, was intended to read as corrected by the Court's alteration.  (Def.'s SUMF ¶ 68
(emphasis added).)

[24] It is unclear whether Plaintiff admits or denies the facts represented in the chart below.   In
Plaintiff's Response to Defendant's SUMF ¶ 68, Plaintiff states: "Admitted."  In her response to
Defendant's SUMF ¶ 69, however, Plaintiff states: "Admitted as to the general statement but not
as to the chart created by Defendant." (*Id.* ¶ 69.) As Defendant's SUMF ¶ 69 does not contain a
chart, the Court finds that Plaintiff is referring to the chart in ¶ 68.  As Plaintiff's response to the

| Last Name | Gender | Race | T-Time Hours Paid in 2010 |
|---|---|---|---|
| Brock | | | 11.99 |
| Brown | Female | White | 67.62 |
| Buckley | Male | White | 20.39 |
| Cameron | Male | White | 33.39 |
| Childress | Male | White | 395.6 |
| Chu | Male | Asian | 438.37 |
| Collins | Male | White | 80.66 |
| Cooper | Male | Black | 670.32 |
| Danbury | Male | White | 626.49 |
| Dernbach | Male | White | 148.18 |
| Elie | Male | | 36.36 |
| Fernandez | | | 108.42 |
| Fladger | Male | Black | 148.38 |
| Fort | | | 26.43 |
| Frederick | Male | Black | 366.93 |
| Henderson | | | 166.17 |
| Hogan | Male | Black | 38.04 |
| Imperiale | Male | White | 50.78 |
| Jackson | Female | Black | 47.78 |

chart does not state each material fact in dispute and does not cite to affidavits or other documents in support as required by Local Civil Rule 56.1(a), the Court deems the information contained in the chart undisputed. *See Juster Acquisition Co.*, 2014 WL 268652, at *1 n.1 ("[A]ny statement, or portion thereof, that is not clearly denied—in *substance*, not merely with the label 'disputed'— and with a proper citation to the record in a responsive Rule 56.1 statement is deemed admitted.").

| Jones | Male | White | 944.61 |
|---|---|---|---|
| Lampkin | Female | Black | 86.26 |
| Langan | Male | White | 296.18 |
| Lee | Male | White | 147.37 |
| Lyden | | | 64.62 |
| Mazzara | Female | White | 50.51 |
| Meehan | | | 100.43 |
| Mizeraczak | | | 80.83 |
| Mooney | Male | White | 70.21 |
| Moore | | | 102.57 |
| Nemeth | Male | White | 398.2 |
| Nguyen | | | 233.79 |
| Northcutt | Male | White | 956.54 |
| Novak | Female | White | 357.74 |
| Parkerson | Male | White | 80.47 |
| Patel | | Indian/South Asian | 175.71 |
| Romanow | | | 1.58 |
| Rouse | | | 92.15 |
| Smith | Male | Black | 146.72 |
| Sohenuick | | | 211.41 |
| Teehan | Female | White | 417.8 |
| Thomas | | | 324.15 |
| Walker | | | 268.54 |

| Young | Female | White | 55.62 |
|-------|--------|-------|-------|

(*Id.*)

"In August or September 2010, [Plaintiff] learned that Danbury and Jones had been paid for more T-[T]ime than she had been paid."[25] (*Id.* ¶ 69.) Plaintiff "then initiated EEO contact on September 29, 2010, complaining of the T-[T]ime discrepancy . . . . [S]he requested a meeting with Herrick, Jackson, and Danbury to discuss the T-[T]ime issue and other grievances." (*Id.* ¶ 70.) "Danbury was present at this meeting in his role as [Plaintiff's] representative for the organization that represents Postal supervisors." (*Id.* ¶ 71.) "During the meeting, [Plaintiff] complained about what she perceived as a lack of T-[T]ime, and Herrick agreed with her that she was entitled to T-[T]ime for any overtime hours that she had worked."[26] (*Id.* ¶ 72.)

"[Plaintiff] also aired other grievances, including complaints related to her application for a level 22 position . . . and complaints about being denied FSS training, and she also requested a 'CA-2,' which is a form that is submitted to the Department of Labor [("DOL")] that [Plaintiff] described as 'basically a workers' comp[ensation] claim.'" (*Id.* ¶ 73.) Plaintiff "complained that her supervisors refused to provide this form and pressured her not to submit it, but testified that the form was ultimately provided to her four days later (on October 5) and submitted to the DOL." (*Id.* ¶ 74.) "The DOL denied the claim after finding that she did not have a work-related condition . . . ." (*Id.* ¶ 75.)

---

[25] Plaintiff's response to Defendant's SUMF states: "Admitted as to the general statement . . . ." (Pl.'s Resp. to Def.'s SUMF ¶ 69.)

[26] Plaintiff's response to Defendant's SUMF states: "It is agreed that Herrick so testified. But he took no steps to see that Plaintiff was paid her T-[T]ime." (Pl.'s Resp. to Def.'s SUMF ¶ 72.)

Plaintiff "stopped working at the Trenton P&DC on or about October 1, 2010." (*Id.* ¶ 77.) "After October 1, she used (and was paid for) 'several months' of annual leave and sick leave until she exhausted that leave." (*Id.* ¶ 78.) "Thereafter she was on 'leave without pay' status until her transfer to Florida and she resumed working." (*Id.* ¶ 79.)

### 6.   Administrative Leave

"On approximately March 15, 2011, [Plaintiff] requested to be placed on 'administrative leave' until she returned to duty." (*Id.* ¶ 80.) "By letter dated March 23, 2011, Herrick denied the request." (*Id.* ¶ 81.) Plaintiff "claimed that Herrick had allowed Theresa Latella, a white woman, to be on administrative leave, and in her administrative grievances [Plaintiff] complained of racial discrimination (although that claim is not contained in her complaint in this case)."[27] (*Id.* ¶ 82.) Plaintiff "explained that she felt she and Latella were similarly situated." (*Id.* ¶ 83.) Plaintiff testified that:

> Latella was "maybe in her 70s or 80s" (she was in fact in her 90s
> . . .), that she was a craft employee, that she worked in the "retail"
> area (open to members of the public) and not the "plant" area (where
> [Plaintiff] worked), and that she had been placed on administrative
> leave after she "was found on the floor" at work and management
> wanted to schedule her for a "fitness for duty" examination.

(*Id.* ¶ 84.) "Shortly after these events[,] Latella passed away."[28] (*Id.* ¶ 85.) Plaintiff "also compared herself to an employee named Frank Nagle, who worked in a different facility across the street, . . . who was not under Herrick's supervision." (*Id.* ¶ 86.)

---

[27] Plaintiff's response to Defendant's SUMF states: "Admitted as to statement but not comment in parentheses." (Pl.'s Resp. to Def.'s SUMF ¶ 82.) Plaintiff's blanket denial without any citation to her Complaint is baseless. The Court, therefore, deems Def.'s SUMF ¶ 82 undisputed.

[28] Plaintiff's response to Defendant's SUMF states: "Denied." (Pl.'s Resp. to Def.'s SUMF ¶ 85.) The Court, however, does not find this fact to be material.

7.    Failure to Promote

Plaintiff "also claims that the Postal Service discriminated against her by not promoting her to a level 22 position." (*Id.* ¶ 87.) Plaintiff "testified that there was a 'posting' on an internal postal system advertising a level-22 opening in Trenton, and she applied in 2010." (*Id.* ¶ 88.) "Shortly after she applied the 'position was withdrawn.'" (*Id.* ¶ 89.) Plaintiff "does not know whether anyone else applied . . . ; she never spoke with Herrick, Jackson, or any other supervisor about this position . . . ; she never interviewed for the position . . . ; and no one was ultimately hired for the job."[29] (*Id.* ¶ 90.)

8.    Denial of Higher Pay

"Plaintiff never received [l]evel 22 pay." (Pl.'s CSUF ¶ 35.) Plaintiff "complains that she should have received level 22 pay instead of level 19 pay because she was performing level-22-type duties, and she complains that Danbury and Jones received level 22 pay when she did not." (Def.'s SUMF ¶ 91.) "Jones was detailed to a level 22 in 2010." (*Id.* ¶ 92.) "Danbury was detailed to a level 19 in 2010, then to a level 22 in January 2011 when Butch Moore retired." (*Id.* ¶ 93.) Plaintiff "was detailed to a level 19 in 2010." (*Id.* ¶ 94.) "A level 17 supervisor who is 'detailed' to a higher level receives only a 5% pay increase over his or her base salary, regardless of whether the detail is to a level 19 or a level 22." (*Id.* ¶ 95.) "Neither Danbury nor Jones received level 22 pay in 2010, they received level 17 pay plus 5%." (*Id.* ¶ 96.)

---

[29] Plaintiff's response to Defendant's SUMF states: "Admitted that Plaintiff so testified." (Pl.'s Resp. to Def.'s SUMF ¶ 90.) Given that Plaintiff does not state that she disputes the alleged facts, and because Plaintiff's response does not cite to affidavits or other documents in support as required by Local Civil Rule 56.1(a), the Court deems Defendant's SUMF ¶ 90 undisputed.

**B.     Disputed Facts[30]**

1.      Altercation with Sung Choi; Rehabilitation Act Claim

It is disputed whether Plaintiff sought a transfer due to her altercation with Sung Choi. (Pl.'s CSUF ¶ 49; Def.'s Resp. to Pl.'s CSUF ¶ 49.)  Additionally, it is disputed whether there is any evidence that Plaintiff "need[s] the support her [h]usband gave her" due to the "emotional toll the work environment was taking on her." (Pl.'s CSUF ¶ 44; Def.'s Resp. to Pl.'s CSUF ¶ 44.)

2.      Denial of Training

The parties dispute whether Jones refused to go to the training or voluntarily chose not to attend the training. (Def.'s SUMF ¶ 57; Pl.'s Resp. to Def.'s SUMF ¶ 57.)

3.      Unpaid T-Time

First, it is disputed whether Plaintiff actually worked any unpaid T-Time hours and whether she ever raised the issue with Jackson. (Pl.'s CSUF ¶¶ 25-26; Def.'s Resp. to Pl.'s CSUF ¶¶ 25-26.)  "Plaintiff believes that she is owed [six] hours of T-Time for every week during a two-year period, which Defendant disputes. (Pl.'s CSUF ¶ 33; Def.'s Resp. to Pl.'s CSUF ¶ 33.) It is further disputed whether any policy existed that required some supervisors to work unpaid T-Time hours. (Pl.'s CSUF ¶ 27; Def.'s Resp. to Pl.'s CSUF ¶ 27.)  The parties also dispute whether Plaintiff was ever told that such a policy existed. (Pl.'s CSUF ¶¶ 34, 59, 90, 92; Def.'s Resp. to Pl.'s CSUF ¶¶ 34, 59, 90, 92.)  "Danbury testified that the reduced T-[T]ime directive resulted in a lot of people working off the clock" and that the Post Office was aware. (Pl.'s CSUF ¶ 90; Def.'s Resp. to Pl.'s CSUF ¶ 90.)

---

[30] The Court omits duplicative recitation of the factual disputes set forth in the footnotes corresponding to the "Undisputed Facts" section. *See supra* I.A.

      4.    Denial of Higher Pay

It is disputed whether Danbury and Jones were paid at level 22. (Pl.'s CSUF ¶¶ 36, 61; Def.'s Resp. to Pl.'s CSUF ¶¶ 36, 61.)

      5.    Retaliation Claim

It is disputed as to when Plaintiff first discussed a transfer with Herrick. (Pl.'s CSUF ¶ 43; Def.'s Resp. to Pl.'s CSUF ¶ 43.) It is further disputed whether Herrick and Jackson intentionally refused to communicate with Plaintiff "about anything." (Pl.'s CSUF ¶ 50; Def.'s Resp. to Pl.'s CSUF ¶ 50.) Additionally, the parties dispute whether there is any evidence that Jackson "warned Herrick that Plaintiff had been looking into various issues." (Pl.'s CSUF ¶ 60; Def.'s Resp. to Pl.'s CSUF ¶ 60.) The parties further dispute whether Plaintiff was refused training in retaliation for her request for transfer. (Pl.'s CSUF ¶ 79; Def.'s Resp. to Pl.'s CSUF ¶ 79.)

## II.   **Legal Standard**

Summary judgment is appropriate if the record shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. A material fact raises a "genuine" dispute "if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party." *Williams v. Borough of W. Chester*, 891 F.2d 458, 459 (3d Cir. 1989) (quoting *Anderson*, 477 U.S. at 250).

In evaluating the evidence, the Court must consider all facts and their logical inferences in the light most favorable to the non-moving party. *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002). While the moving party bears the initial burden of proving an absence of a genuine dispute

of material fact, meeting this obligation shifts the burden to the non-moving party to "set forth

specific facts showing that there is a genuine [dispute] for trial." *Anderson*, 447 U.S. at 250. If

the non-moving party fails to:

> make a showing sufficient to establish the existence of an element
> essential to that party's case, and on which that party will bear the
> burden of proof at trial[,] . . . . there can be "no genuine [dispute] of
> material fact," [because] a complete failure of proof concerning an
> essential element of the non[-]moving party's case necessarily
> renders all other facts immaterial.

*Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting *Celotex Corp. v. Catrett*,

477 U.S. 317, 322-23 (1986)).

## III.   Parties' Positions

### A.   Count One: Title VII

#### 1.   Denial of Training Claim

Defendant first argues that Plaintiff fails to establish a prima facie claim under Title VII

because "there was no adverse employment action" with regard to many of Plaintiff's Title VII

claims. (Def.'s Moving Br. 25, ECF No. 16-1.) With regard to Plaintiff's Denial of Training

Claim, Defendant argues that Plaintiff already received FSS machine training, and that she was

only denied a *second* training. (*Id.* at 25.) Further, Defendant asserts that Plaintiff "admitted that

she was never denied a promotion as a result of not receiving more training, . . . her pay was not

affected, . . . and no other term or condition of her employment was affected." (*Id.*) Plaintiff,

therefore, has not established an adverse employment action. (*Id.* at 24-26.)

In response, Plaintiff argues that the training "would have enhanced [her] skill set,

improved her ability to do her job and make her more attractive for promotions." (Pl.'s Opp'n Br.

15, ECF No. 18.) Plaintiff asserts that Herrick has given inconsistent reasons for removing her

from the training opportunity. (*Id.*) Plaintiff further argues that "[n]o one can say whether if

[P]laintiff had gone through that training she may have been a more desirable candidate for a promotion over someone else." (*Id.*)

### 2. Failure to Transfer Claim

Next, Defendant argues that Plaintiff's Failure to Transfer Claim also does not contain an allegation of adverse employment action. (Def.'s Moving Br. 26-27.) Defendant asserts that it granted Plaintiff's request for transfer as soon as a vacant funded position that met Plaintiff's requirements became available. (*Id.*)

In response, Plaintiff does not address Defendant's argument concerning the lack of adverse employment action. Rather, Plaintiff argues that Defendant failed to engage Plaintiff in an interactive process to determine a reasonable accommodation. (Pl.'s Opp'n Br. 16-19.)

### 3. Failure to Process Paperwork Claim

Similarly, Defendant argues that Plaintiff's Failure to Process Paperwork Claim is merely a complaint that Plaintiff was not provided a missing workers' compensation form until four days after the request. (Def.'s Moving Br. 27.) Defendant asserts that Plaintiff has failed to allege any prejudice arising from the four-day delay, and it is unaware of any authority that a four-day delay can constitute adverse employment action for the purposes of a Title VII action. (*Id.* at 27-28.)

Plaintiff responds that "[t]he issue is not the length of the delay," but rather "why [there was] a delay." (Pl.'s Opp'n Br. 20.) Plaintiff argues that Defendant's motive for causing the delay is a question for the jury. (*Id.* at 20-21.)

### 4. Denial of Higher Level Pay Claim

With regard to Plaintiff's Denial of Higher Level Pay Claim, Defendant argues that Plaintiff's pay was not affected. (Def.'s Moving Br. 28.) Defendant argues that as a level 17, Plaintiff receives a 5% bump in salary regardless of whether she is "detailed" to a level 19 or level

22. (*Id.*)  Therefore, the fact that Plaintiff was detailed to level 19 but allegedly performed level 22 work would not affect Plaintiff's pay.  (*Id.*)  In response, Plaintiff alleges that Jones and Danbury were paid at a level 22 in 2010, even though they were level 19 detailed at level 22. (Pl.'s CSUF ¶ 36.)

> ### 5.   Failure to Promote Claim

As to Plaintiff's Failure to Promote Claim, Defendant argues that Plaintiff fails to satisfy the fourth element of a sufficient claim: that "after her rejection, the position remained open and the employer continued to seek applicants with the employee's same qualifications."  (Def.'s Moving Br. 33.)  According to Defendant, Plaintiff "concedes that the position did not remain open and was never filled." (*Id.*)  Because no one filled the position, Plaintiff cannot be compared to anyone to analyze whether an inference of discrimination exists. (*Id.* at 33-34.)

Plaintiff responds by arguing that a jury should have the opportunity to look at the "totality of the circumstances" and examine why the job opening was withdrawn. (Pl.'s Opp'n Br. 21.) Plaintiff argues that a jury could find that the posting was withdrawn in retaliation to Plaintiff's complaints about race and gender discrimination. (*Id.*)

> ### 6.   Legitimate Nonretaliatory and Nondiscriminatory Reasons; Pretext for Discrimination or Retaliation

Additionally, with regard to Plaintiff's Denial of T-Time Claim, Denial of Administrative Leave Claim, Denial of Higher Pay Claim, and Failure to Promote Claim, Plaintiff's allegations of racial and gender discrimination fail, according to Defendant, because she fails to establish disparate treatment as compared to similarly situated employees. (Def.'s Moving Br. 28.)  First, with regard to her Denial of Higher Pay Claim, Defendant argues that Plaintiff's self-comparison to Roger Danbury and Bill Jones—two white males—is improper "because they worked different

tours, they had different supervisors, different schedules, and different job responsibilities than [Plaintiff]." (*Id.* at 29.)

Similarly, as to Plaintiff's Denial of T-Time Claim, Defendant argues that Plaintiff "convenient[ly] select[s]" two white male employees who happened to work more overtime, while ignoring the many that worked less than Plaintiff. (*Id.* at 31.) Defendant adds that the record does not support Plaintiff's alleged policy of requiring supervisors to work unpaid overtime hours. (*Id.* at 32.) Moreover, Defendant asserts that the data shows that members of protected classes were not being treated differently than their white male counterparts. (*Id.* at 31-32.)

Next, Defendant argues that even if Plaintiff were to be successful in establishing a prima facie claim, Defendant has established legitimate, non-discriminatory reasons for its actions. (*Id.* at 34-35.) Defendant asserts that Plaintiff is unable to demonstrate that Defendant's reasons for its actions are pretexts for discrimination. (*Id.* at 35.)

Plaintiff responds that comparison to Danbury and Jones—two white males—is appropriate because they are all level 17 supervisors detailed as level 19. (Pl.'s Opp'n Br. 10-11.) She argues that the "similarly situated" standard requires comparators to be similarly situated "in all relevant aspects." (*Id.* at 11 (quoting *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 881-82 (3d Cir. 2011)).) Plaintiff argues that she was subjected to an improper directive that no T-Time would be given to specifically level 17 supervisors that were detailed as level 19 managers. (*Id.* at 11-12.) She argues that only herself, Danbury, and Jones meet these qualifications and are therefore appropriate comparators. (*Id.* at 11.) Based on this comparison, Plaintiff argues that the white males were able to ignore the directive, while she was not. (*Id.* at 12, 22.)

Plaintiff further adds that she has established the remaining prima facie elements on her Denial of T-Time Claim. (*Id.* at 12.) Plaintiff argues that she has established that the directive

existed, and that she was not permitted to ignore the directive unlike Danbury and Jones, which demonstrates favorable treatment to similarly situated white male employees. (*Id.* at 12, 22.) Plaintiff also argues that the evidence set forth is sufficient to establish that Defendant's non-discriminatory reasons for the alleged conduct were mere pretext for discrimination. (*Id.* at 13-14.)

In reply, Defendant argues that Plaintiff earned more T-Time hours than seventeen other supervisors, demonstrating the lack of disparate treatment. (Def.'s Reply Br. 4, 6-8, ECF No. 19.) Defendant further points out that Plaintiff admits that Jones and Danbury work different tours, which have fewer employees and supervisors, and that Jones and Danbury had different supervisors than Plaintiff. (*Id.* at 4.) Jones and Danbury, therefore, are not appropriate comparators according to Defendant. (*Id.* at 3-6.)

### 7.   Retaliation Claim

With regard to Plaintiff's Retaliation Claim under Count One, Defendant argues that the timing of the events alleged could not be found to support a retaliation claim. (Def.'s Moving Br. 36-37.) Defendant states that Plaintiff's initial contact with an EEO counselor on September 29, 2010, and that she filed a formal complaint on January 7, 2011. (*Id.* at 36.) Given that Plaintiff stopped working in Trenton on or about October 1, 2010 and that Plaintiff's grievances primarily occurred before she stopped working, Defendant argues that retaliation could not have occurred. Defendant agrees that some of Plaintiff's grievances arose after her EEO activity—alleged delay in transfer, failure to process paperwork, and denial of administrative leave—but argues that the record does not support a retaliation claim. (*Id.*) The transfer was granted, the paperwork was processed, and the denial of administrative leave took place six months after the initial contact with an EEO counselor, which is too late to give rise to an inference of retaliation. (*Id.*)

In Plaintiff's opposition, she argues that she was subjected to adverse employment action because she was "denied compensation, terms, conditions and privileges of employment without any wrongdoing on her part." (Pl.'s Opp'n Br. 14.) Next, she argues that she was engaged in protected activity prior to seeing the EEO counselor on September 29, 2010. (*Id.* at 23.) According to Plaintiff, she continuously raised allegations of racial and gender discrimination throughout 2010. (*Id.* at 23-24.)

### 8.    Hostile Work Environment Claim

Defendant argues that Plaintiff fails to establish the prima facie elements of a Hostile Work Environment Claim. (Def.'s Moving Br. 37.) According to Defendant, Plaintiff fails to establish a sufficiently "severe or pervasive" discrimination and detrimental effect. (*Id.* at 37-38.) Further, Defendant argues that Plaintiff fails to "establish *respondeat superior* liability because the record establishes that [Plaintiff's] supervisors had little, if any, control over the circumstances that led to [Plaintiff] and Choi being placed on the same tour together." (*Id.* at 38.) Defendant argues that it took the appropriate measures, and that even if Defendant had not taken those steps, Plaintiff cannot hold Defendant liable for a hostile work environment for "mere presence of an individual with whom she had previously had a verbal altercation." (*Id.* at 39.)

Plaintiff responds by first reiterating that she was intimidated by a male employee in a loud and threatening manner. (Pl.'s Opp'n Br. 24.) Plaintiff argues that it is irrelevant that she never had a second incident with Choi, and that the fact it occurred is sufficient for her claim. (*Id.* at 25.) She argues that she has suffered "sleep problems, anxiety and headaches related to going to work." (*Id.*) Plaintiff asserts that this condition worsened "once she discovered she was the only supervisor detailed as a manager who was not being paid for the full hours Herrick required her to be in the building." (*Id.*)

9.    Denial of Administrative Leave Claim

In Defendant's Reply, Defendant argues that Plaintiff conceded that the administrative leave argument was not contained in Plaintiff's Complaint. (Def.'s Reply Br. 1; Def.'s Moving Br. 36.)

**B.    Count Two: Rehabilitation Act**

Here, Defendant argues that it is not required to create a new job under the Rehabilitation Act. (Def.'s Moving Br. 40.) Rather, a transfer is required only where there is a "funded vacant position *in the same commuting area*." (*Id.*) Moreover, the request was ultimately granted.

Plaintiff argues that Defendant failed to engage Plaintiff in an interactive process to determine a reasonable accommodation.[31] (Pl.'s Opp'n Br. 17-19.) Moreover, Plaintiff claims that "through counsel[,] [she] identified viable jobs in the Florida district" for her transfer. (*Id.* at 26.) Plaintiff asserts that forming a DRAC committee was insufficient to satisfy the interactive process requirement. (*Id.*) In response to being asked "[w]hat are your current medical restrictions, Hensel wrote 'relocate to Florida District 5AM-5PM-M-F.'" (*Id.* at 28.) Plaintiff argues that the DRAC form does not state the essential functions for her position, and states that no positions were found without any further explanation. (*Id.*) Plaintiff further suggests that Hensel knew about her EEO complaint and that this knowledge may have incentivized her failure to engage in an interactive process with Plaintiff on her request for transfer. (*Id.*)

---

[31] The Court treats Plaintiff's argument that she has a "cause of action" for Defendant's alleged failure to engage in an interactive process as part of Plaintiff's Rehabilitation Act claim. To the extent that Defendant is correct in that Plaintiff is arguing that the failure to engage in an interactive process is a separate cause of action, the Court dismisses this claim as Plaintiff did not plead this claim in her Complaint.

### C.   Count Three: Fair Labor Standards Act

Defendant acknowledges that Plaintiff brings a claim under the Fair Labor Standards Act, but makes no substantive arguments in its submission. (*See* Def.'s Moving Br. 1, 4.)

## IV.   <u>Discussion</u>

### A.   Count One: Title VII

All the claims under Title VII are governed by the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973), burden-shifting framework. *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 841 (3d Cir. 2016). First, a plaintiff must establish "a prima facie case of discrimination or retaliation." *Id.* at 842. Then, the burden shifts to the employer "to articulate a legitimate, nonretaliatory or nondiscriminatory reason for its actions." *Id.* Finally, "the burden then shifts back to the plaintiff to prove that the employer's nonretaliatory or nondiscriminatory explanation is merely a pretext for the discrimination or retaliation." *Id.*

To establish a prima facie case of discrimination or retaliation, a "plaintiff must first establish that: (1) she is a member of a protected class; (2) she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) that adverse employment action gives rise to an inference of unlawful discrimination." *Id.* An adverse employment action must be "material" and must be "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Id.* (quoting *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001)).

The employer's burden to "articulate some legitimate, nondiscriminatory reason" is "relatively light." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). The employer must "introduce[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Id.*

To show such pretext, a plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Tourtellotte*, 636 F. App'x at 842 (quoting *Tomaso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006)). To do so, a plaintiff "must 'demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] nondiscriminatory reasons.'" *Id.* (alteration in original) (quoting *Tomaso*, 445 F.3d at 706).

      1.   Adverse Employment Action

An adverse employment action is "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015) (quoting *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)). "Title VII . . . , therefore, do[es] not provide relief for general unpleasantness that can occur in the workplace, even if that unpleasantness may be motivated by racial [or gender-related] animus." *Barnes v. Nationwide Mut. Ins. Co.*, 598 F. App'x 86, 90 (3d Cir. 2015).

Here, Plaintiff makes the following eight claims under Title VII: (1) Denial of Training; (2) Failure to Transfer; (3) Failure to Process Paperwork; (4) Denial of Higher Level Pay; (5) Failure to Promote; (6) Denial of T-Time; (7) Retaliation; and (8) Hostile Work Environment.[32]

---

[32] Defendant argues that Plaintiff intends to pursue a separate claim of Denial of Administrative Leave under Title VII, and asserts that the Court should refuse to recognize the claim because it was never pled in the Complaint. (Def.'s Moving Br. 34 n.11.) Upon review of Plaintiff's

(*See* Compl. ¶¶ 6-20.)  Of the eight claims, Plaintiff fails to sufficiently establish an adverse employment action for claims (1), (2), and (3).

As to claim (1), Denial of Training, it is undisputed that Plaintiff "was not denied any promotion due to not attending this training, . . . nor was her pay affected."  (Def.'s SUMF ¶ 58.) Plaintiff's blanket statement "Denied" is insufficient to create a genuine dispute of material fact absent any citation to the record.  *See Juster Acquisition Co. v. N. Hudson Sewerage Auth.*, No. 12-3427, 2014 WL 268652, at *1 n.1 (D.N.J. Jan. 23, 2014) ("[A]ny statement, or portion thereof, that is not clearly denied—in *substance*, not merely with the label 'disputed'—and with a proper citation to the record in a responsive Rule 56.1 statement is deemed admitted.").  Moreover, Plaintiff fails to allege any facts in her CSUF that indicate an adverse employment action.  Based on the undisputed material facts alleged, the Court finds that no reasonable jury could find that Plaintiff suffered an adverse employment action as to her Denial of Training Claim.

As to claim (2), Failure to Transfer, "[e]mployment actions such as lateral transfers . . . have generally been held not to constitute adverse employment actions." *Barnes*, 598 F. App'x at 90.  Here, it is undisputed that in June 2011, both the Postal Service and Plaintiff's attorney identified potential job openings that fit Plaintiff's request to transfer to Florida and Plaintiff's medical restrictions.  (Def.'s SUMF ¶ 32; Pl.'s CSUF ¶ 47; Pl.'s Opp'n Br. 17.)  Plaintiff makes no allegations that Defendant "denied [her] an available transfer, that [Defendant] failed to pay [her] salary during the interim period, or that the delay in any way harmed [her] career." *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (repeatedly cited by the Third Circuit for this proposition: *Stewart v. Union Cty. Bd. of Educ.*, No. 15-3970, 2016 WL 3743181, at *4 (3d

---

opposition brief, however, the Court does not find that Plaintiff seeks to bring a separate new claim for Denial of Administrative Leave.

Cir. July 13, 2016); *Barnes*, 598 F. App'x at 90; *Walker v. Centocor Orotho Biotech, Inc.*, 558 F. App'x 216, 219 (3d Cir. 2014)).  Based on the undisputed material facts alleged, the Court finds that no reasonable jury could find that Plaintiff suffered an adverse employment action as to her Denial of Transfer Claim.

As to claim (3), Failure to Process Paperwork, Plaintiff again fails to sufficiently establish an adverse employment action.  It is undisputed that after Plaintiff requested a CA-2 form, which is a workers' compensation form for work related injuries, that Defendant provided the form four days later.  (Def.'s Moving Br. 19; Pl.'s Opp'n Br. 20.)[33]  Plaintiff fails to allege or argue that the delay constituted an adverse employment action, and argues merely that Defendant's delay was motivated by improper reasons.  (Pl.'s Opp'n Br. 20.)  Based on the undisputed material facts alleged, the Court finds that no reasonable jury could find that Plaintiff suffered an adverse employment action as to her Failure to Process Paperwork Claim.

As to claim (4), Denial of Higher Level Pay, the Court finds that a genuine dispute of material fact exists with regard to the existence of an adverse employment action.  It is disputed whether the comparators Plaintiff selected—Danbury and Jones—received additional compensation in violation of the policy applied to Plaintiff.  (Pl.'s CSUF ¶ 36; Def.'s Resp. to Pl.'s CSUF ¶ 36.)  Higher pay is a "tangible" consequence that "alter[s] . . . [Plaintiff's] compensation," and therefore constitutes an adverse employment action.  *Jones*, 796 F.3d at 326 (quoting *Storey*, 390 F.3d at 764).  Moreover, the dispute as to whether Jones and Danbury were paid on a different scale than the policy applied to Plaintiff is material to the other elements of the *McDonnell Douglas* framework.  Defendant's proffered nonretaliatory and nondiscriminatory reasons for the salary

---

[33] Although neither party specifically alleges that the delay was four days in their respective Rule 56.1 statements, both parties allege that the delay was four days in their respective briefs.

Plaintiff earns can only be legitimate if Jones and Danbury are subjected to the same salary scale as Plaintiff. Count One, as to the Denial of Higher Level Pay, therefore, survives Defendant's Motion for Summary Judgment.

### 2. Claim (5): Failure to Promote

To establish the prima facie elements of a failure-to-promote claim, Plaintiff must establish that: (1) she belongs to a protected class; (2) she applied for a position and was qualified for the position "for which the employer was seeking applicants"; (3) "that, despite [her] qualifications, [she] was rejected"; and (4) "that, after [her] rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). "As an alternative to the original fourth prong of the prima facie case, a plaintiff may show that similarly situated individuals outside the plaintiff's class were treated more favorably." *Grassmyer v. Shred-It USA, Inc.*, 392 F. App'x 18, 27 (3d Cir. 2010).

Here, it is undisputed that no one was ever hired for the position because the job opening was withdrawn. (Def.'s SUMF ¶¶ 87-90.) Moreover, Plaintiff does not put forth any similarly situated applicants that were allegedly treated differently in the context of her Failure to Promote Claim. Based on the undisputed material facts alleged, therefore, the Court finds that no reasonable jury could find that Plaintiff established the fourth prima facie element of her Failure to Promote Claim.

### 3. Legitimate Nonretaliatory and Nondiscriminatory Reasons; Pretext for Discrimination or Retaliation

As to claims (6) and (8), the Court finds that Defendant sufficiently established legitimate nonretaliatory and nondiscriminatory reasons for its actions, and that Plaintiff failed to sufficiently establish that Defendant's proffered reasons were merely pretexts for discrimination or retaliation.

First, as to claim (6), Denial of T-Time, Plaintiff argues that she was provided fewer overtime opportunities than her white male counterparts. (Def.'s SUMF ¶¶ 64-65.) Specifically, she compares herself to Danbury and Jones, who were permitted to work more overtime hours than Plaintiff. (*Id.*)

In response, Defendant argues that Danbury and Jones had different overtime opportunities than Plaintiff "because they worked different tours, they had different supervisors, different schedules, and different job responsibilities than [Plaintiff]." (Def.'s Moving Br. 29.) As evidence of the fact that the disparity was not caused by racial animus, Defendant submitted a chart of the overtime worked by supervisors at the Trenton P&DC in 2010, indicating name, race, gender, and number of T-Time hours paid. (Def.'s SUMF ¶ 68.) Plaintiff's blanket denial of the chart does not give rise to a genuine dispute of the information contained in the chart. *See Juster Acquisition Co.*, 2014 WL 268652, at *1 n.1 ("[A]ny statement, or portion thereof, that is not clearly denied— in *substance*, not merely with the label 'disputed'—and with a proper citation to the record in a responsive Rule 56.1 statement is deemed admitted."). Plaintiff does not argue, and it does not appear to the Court, that the chart reflects any pattern of disparate overtime opportunities based on race or gender.

Here, Plaintiff fails to identify any "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons." *Tourtellotte*, 636 F. App'x at 842. Plaintiff merely argues that Jones and Danbury are proper comparators in the context of establishing her prima facie case, but fails to argue in the context of establishing Defendant's proffered legitimate reasons as pretexts for discrimination or retaliation. Based on the undisputed material facts alleged, therefore, the Court concludes that no reasonable jury could find that Plaintiff overcame Defendant's proffered legitimate reasons for its actions.

Similarly, as to claim (8), Hostile Work Environment, the Court finds that Plaintiff fails to overcome Defendant's proffered legitimate reasons for its conduct. Plaintiff contends that she was subjected to a hostile work environment "due to her race and gender." (Pl.'s Opp'n Br. 24.) This claim arises from a single altercation between Plaintiff and Choi, and from the fact that Plaintiff and Choi eventually worked on the same tour together some time after the altercation. (Def.'s SUMF ¶¶ 34-47.)

Defendant offers legitimate and nondiscriminatory reasons for the initial altercation and the subsequent schedule that placed Plaintiff and Choi on the same tour. Defendant asserts, and it is undisputed, that Choi alone was responsible for the altercation, and that Choi was scheduled for the same tour as Plaintiff only after the American Postal Workers Union filed a successful grievance for Choi to be reinstated to that specific tour. (Def.'s Moving Br. 38-39.) Plaintiff's response merely relies on the fact that Choi is a male and Plaintiff is a female, and on various stress related conditions she suffered as a result of the altercation despite her complaints to supervisors. (Pl.'s Opp'n Br. 25.) These arguments fail to sufficiently establish that Defendant's proffered reasons for its actions constitute pretexts for discrimination or retaliation.

      4.    Claim (7): Retaliation

To establish a prima facie case of retaliation under Title VII, a plaintiff must prove: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006). As to the first element, the plaintiff must hold an "objectively reasonable belief, in good faith," that the activity she opposes is unlawful under Title VII. *Id.* at 341. As to the second element, the plaintiff must show "a reasonable employee would have found the challenged action

materially adverse," meaning, "[the challenged action] well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). As to the third element, the plaintiff must "identif[y] what harassment, if any, a reasonable jury could link to a retaliatory animus." *Moore*, 461 F.3d at 342.

If the plaintiff can establish a prima facie case as outline above, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct." *Id.* (internal quotation marks omitted). If the employer can do that, the burden shifts to the plaintiff to "produce some evidence from which a jury could reasonably reach the[] conclusion[]" "that [(1)] the employer's proffered explanation was false, and [(2)] that retaliation was the real reason for the adverse employment action." *Id.*

Plaintiff's core contention is that "throughout 2010" she reported to Jackson an alleged discriminatory pay discrepancy—Plaintiff's Unpaid T-Time, Denial of T-Time, and Denial of Higher Pay Claims—that led to Defendant's subsequent retaliatory conduct. (Pl.'s Opp'n Br. 23-24.) Plaintiff argues that, after she engaged in this "protected" activity, Defendant denied her FSS Training (*id.* at 15), denied her transfer request to Florida (*id.* at 16-19), delayed in providing and processing Plaintiff's CA-2 forms (*id.* at 20), and withdrew a job opening when she applied (*id.* at 21).

With regard to Plaintiff's claim that Defendant retaliated against her by originally denying her transfer request, Plaintiff fails to overcome Defendant's proffered legitimate reasons. It is undisputed that Keen, the District Human Resource Manager for Plaintiff's district, emailed his counterpart in the Sun Coast District, which encompasses Florida, to inquire about job openings in light Plaintiff's transfer request. (Def.'s SUMF ¶ 30.) It is further undisputed that Keen's

33

counterpart responded that no vacancies existed matching Plaintiff geographic and medical limitations. (*Id.* ¶ 31.) Moreover, in a few months' time, Defendant identified appropriate vacancies and granted Plaintiff's transfer request. (*Id.* ¶ 32.) Plaintiff further fails to identify any weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in Defendant's proffered reasons.[34]

With regard to Plaintiff's claim that Defendant retaliated against her by failing to provide and process her CA-2 paperwork for four days, Plaintiff fails to sufficiently establish a prima facie claim for retaliation. The Third Circuit has held that for Plaintiff to establish adverse action in the retaliation context, Plaintiff must allege more than "[p]etty slights, minor annoyances, and simple lack of good manners." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 196 (3d Cir. 2015) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Here, a delay of four days is nothing more than a minor annoyance, and Plaintiff has failed to establish an adverse employment action.

As to Plaintiff's claim that Defendant retaliated against her by denying her a second FSS training opportunity, Plaintiff has failed to establish the second element of retaliation—adverse employment action. Although Plaintiff argues, without further explanation, that the training "would have enhanced [her] skill set," Plaintiff fails to dispute that: she "was not denied any promotion due to attending this training, . . . nor was her pay affected." (Pl.'s Opp'n Br. 15; Def.'s SUMF ¶ 58.) Moreover, Plaintiff admits that she had already received FSS training at the same facility, and fails to set forth any specific reasons why the second training would have enhanced

---

[34] *See infra* IV.B. for further analysis on Plaintiff's failure to raise a genuine dispute of material fact and her failure to overcome Defendant's proffered reasons with regard to the Denial of Transfer Claim.

her skill set. Based on the undisputed material facts, the Court, therefore, finds that no reasonable jury could find that Plaintiff sufficiently established the second element of retaliation.

Lastly, as to Plaintiff's claim that Defendant retaliated against her by failing to promote her, Plaintiff has failed to sufficiently establish a prima facie case of retaliation. Plaintiff's claim fails as a matter of law because Plaintiff fails to establish a failure to promote. Specifically, it is undisputed that the position was withdrawn and that Plaintiff is unaware of anyone being hired for the position. (Def.'s SUMF ¶¶ 89-90); *see, e.g., Ilori v. Carnegie Mellon Univ.*, No. 08-1219, 2010 WL 5092259, at *8 (D.N.J. Dec. 8, 2010) (finding that "plaintiff failed to demonstrate the position in issue remained open, which is a necessary element of a prima facie case for retaliation"); *see also Harley v. Geithner*, No. 07-3559, 2010 WL 3906642, at *16 (D.N.J. Sept. 29, 2010) (finding that a retaliation claim failed where plaintiff assumed that defendant "owed him a promotion"). Moreover, Plaintiff fails to cite to, and the Court is unaware of, any authority where a retaliation claim survived summary judgment based on a failure to promote allegation absent the position being filled by another candidate. Based on the undisputed material facts, the Court, therefore, finds that no reasonable jury could find that Plaintiff sufficiently established retaliation based on a failure to promote Plaintiff.

**B.      Count Two: Rehabilitation Act**

To establish a claim under the Rehabilitation Act, a plaintiff must first prove: "(1) [s]he is a disabled person within the meaning of the ADA; (2) [s]he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [s]he has suffered an otherwise adverse employment decision as a result of discrimination." *Ozlek v. Potter*, 259 F. App'x 417, 419-20 (3d Cir. 2007).

"[T]o determine whether someone is 'a qualified individual with a disability[,]' 29 C.F.R. pt. 1630, App. at 353-54[,]" the Court must first "consider whether the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998) (internal quotation marks omitted). The Court must then "consider whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation." *Id.* (internal quotation marks omitted). "[P]laintiff must make a prima facie showing that reasonable accommodation is possible." *Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir. 1996). The burden then shifts to the defendant to prove "that the accommodations requested by the plaintiff are unreasonable, or would cause an undue hardship on the employer." *Id.*

For a plaintiff to prevail on a failure to transfer claim, she must prove: "(1) that there was a vacant, funded position; (2) that the position was at or below the level of the plaintiff's former job; and (3) that the plaintiff was qualified to perform the essential duties of this job with reasonable accommodation." *Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 230 (3d Cir. 2000). An employer is not required to accommodate by creating a new job, but rather, an employer may be required to transfer an employee to an existing position. *Id.*

Here, Plaintiff offers no evidence that a vacant, funded position, at or below the level of Plaintiff's former job existed in Florida during the time period in question. Even where a plaintiff alleges that an employer failed to engage in a good faith interactive process, the Third Circuit has stated: there is "no doubt that 'it falls to the employee to make at least a facial showing' that there were vacant, funded positions whose essential functions [she] was capable of performing.'" *Id.* at 233 (quoting *Mengine v. Runyon*, 114 F.3d 415, 418 (3d Cir. 1997)). The failure to engage in a

good faith interactive process does not give rise to an independent cause of action, and does not give rise to liability absent a "showing that a reasonable accommodation was possible." *Id.* at 23. In establishing a claim under the Rehabilitation Act, "the burden of proving discrimination . . . falls on the plaintiff." *Id.* at 234.

Here, Plaintiff fails to make a facial showing that a vacant, funded position existed, which complied with the medical restrictions she submitted to Defendant. It is undisputed that Plaintiff requested a transfer to Florida and that Plaintiff submitted her medical documentation setting forth her limitations to Defendant on or about April 13, 2011. (Def.'s SUMF ¶¶ 20-29.) It is further undisputed that Keen, the District Human Resource Manager, emailed his counterpart in the Sun Coast District, which encompasses Florida, and received a response indicating that no vacancies that met Plaintiff's medical limitations was available. (*Id.* ¶¶ 28-30.) Additionally, it is undisputed that approximately one month after Plaintiff submitted her medical limitations to Defendant, that both Defendant and Plaintiff's attorney identified positions that met Plaintiff's criteria. (*Id.* ¶ 32.) Plaintiff's request was approved just two months later, on August 2, 2011. (*Id.* ¶ 33.)

Based on the Court's interpretation of Plaintiff's submissions, Plaintiff's allegations therefore arise solely from the one month period between the initial April 2011 denial of her transfer request, due to the absence of vacancies that complied with Plaintiff's restrictions, and the identification of matching vacant positions in May 2011.[35] Plaintiff, in response, has failed to

---

[35] In Plaintiff's CSUF, Plaintiff cites her own deposition testimony that she went on the "E-Career" website and searched for "supervisor" jobs in Florida. (Pl.'s CSUF ¶ 47; Pl.'s Ex. C (Pl.'s Dep.) 165:16-25, ECF No. 18-3.) Upon closer review of the cited deposition testimony, it is apparent that Plaintiff is referring to a prior discussion about a potential transfer that occurred in 2010. The Court does not find this fact material to Plaintiff's Rehabilitation Act Claim for the following reasons. First, Plaintiff fails to devote any time in her opposition brief to the Rehabilitation Act Claim, other than to argue that Defendant failed to engage in an interactive process. Second, Plaintiff's briefing on her Title VII Denial of Transfer Claim analyzes only the events in connection with the 2011 transfer request. (*See* Pl.'s Opp'n Br. 17.) Third, Plaintiff does not

allege any evidence of vacant funded positions in Florida that complied with her medical restrictions during that one month period. Plaintiff seems to argue that the only reason Defendant identified vacant positions for Plaintiff's transfer was because Plaintiff's counsel first identified those positions and submitted them to Defendant. (Pl.'s Opp'n Br. 17.) Given that Plaintiff fully "admitted" in her Rule 56.1 Statement that Defendant identified the positions in May 2011, the Court finds Plaintiff's argument unpersuasive. (Pl.'s Resp. to Def.'s SUMF ¶ 32.) Plaintiff fails to establish that other vacant positions existed throughout the delay period, during which Defendant asserts that eligible vacancies did not exist. Based on the undisputed material facts alleged, therefore, the Court concludes that no reasonable jury could find that Plaintiff established the prima facie elements of her Rehabilitation Act Claim.

### C.    Count Three: Fair Labor Standards Act

Here, Defendant acknowledges that Plaintiff brings a claim under the Fair Labor Standards Act, but fails to address the claim in its briefing. (*See* Def.'s Moving Br. 1.) Although Defendant's proposed text order (ECF No. 16-27) appears to request dismissal of Plaintiff's entire action, the Court finds no analysis by Defendant in its submissions. Plaintiff accordingly does not appear to respond to any arguments pertaining to Count Three. To the extent that Defendant intended to move for summary judgment on Count Three, the Court, therefore, denies Defendant's Motion as to Count Three without prejudice.

---

analyze the 2010 transfer request. Fourth, Plaintiff's Rule 56.1 Statement does not allege that Plaintiff applied for a transfer in 2010 or that she was denied a transfer in 2010. Moreover, Plaintiff does not assert that she found vacant funded positions that met her medical restrictions. Plaintiff merely alleges that she found supervisor positions in Florida, but fails to allege that they complied with any restrictions she submitted to Defendant. (*See* Def.'s SUMF ¶¶ 28-29; *see also Venner v. Bank of Am.*, No. 07-4040, 2009 WL 1416043, at *4 (D.N.J. May 19, 2009) (declining to "comb through the nearly forty exhibits . . . submitted in order to arrive at an answer" on summary judgment).

## V.    Conclusion

For the reasons set forth above, Defendant's Motion for Summary Judgment is DENIED as to Count One only with regard to Plaintiff's claim of Denial of Higher Pay. Defendant's Motion is GRANTED as to Count One on all other claims. Defendant's Motion is further GRANTED as to Count Two. Additionally, Defendant's Motion is DENIED as to Count Three, but without prejudice. An order consistent with this Memorandum Opinion will be entered.

s/ Michael A. Shipp_____
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

**Dated:** November 30, 2016